UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FRANK R. SAIA, ET AL., | ) | |
| Plaintiffs | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-30143-MAP |
| | ) | |
| | ) | |
| CITY OF WESTFIELD, ET AL., | ) | |
| Defendants | ) | |

REPORT AND RECOMMENDATION WITH REGARD TO
DEFENDANTS' MOTION TO DISMISS (Document No. 13)
September 7, 2006

NEIMAN, C.M.J.

Frank R. Saia ("Saia"), individually and as Administrator of the Frank R. Saia

Defined Benefit Pension Plan (the "Plan"), together with the Limited Dividend

Corporation of Westfield and City View Commons Condominium Trust (collectively

"Plaintiffs"), brings this action against the City of Westfield ("the City") and various of its

officials (collectively "Defendants").[1]  In essence, Plaintiffs challenge the

constitutionality of an aspect of Westfield's zoning scheme as well as an enforcement

action the City initiated on October 5, 2000, with respect to certain property then owned

by Plaintiffs on City View Road.  The enforcement action has not yet run its course.

Pursuant to Fed. R. Civ. P. 12(b)(6) (and presumably Rule 12(b)(1) as well),

---

[1] Defendants include the following officials: unnamed members of the Westfield
Zoning Board and City Council ("John and Jane Does"), Charles Kellogg (former
Inspector of Buildings), Donald C. York (Superintendent of Buildings), James
Boardman (Community Development Director), Dan Reardon (Director of Public
Health), Paul J. Casey (Assistant City Solicitor) and Peter A. Martin (Assistant City
Solicitor).

Defendants have moved to dismiss the complaint, arguing variously that the abstention doctrine established in *Younger v. Harris*, 401 U.S. 37 (1971), mandates dismissal, that applicable statutes of limitations preclude the matter from proceeding, that the doctrine of *res judicata* applies, and that Plaintiffs have failed to state claims upon which relief may be granted. Defendants' motion has been referred to this court by District Judge Michael A. Ponsor for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons stated below, the court agrees with Defendants' abstention argument, particularly when combined with other federalism doctrines. On that basis alone, therefore, the court will recommend that Defendants' motion to dismiss be allowed.

## I. STANDARD OF REVIEW

In considering a Rule 12(b)(1) motion to dismiss, the court must "construe the Complaint liberally and treat all well-pleaded facts as true, according the plaintiff[s] the benefit of all reasonable inferences." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995). Unless the plaintiffs can prove the existence of subject matter jurisdiction, their complaint should be dismissed. *See id.* Similarly, a complaint should be dismissed pursuant to Rule 12(b)(6) "if it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)) (internal quotation marks omitted).

## II. BACKGROUND

The court has taken the bulk of the following background, which reaches back several decades, from Plaintiffs' complaint and has stated the facts in a light most

favorable to them.  Unfortunately, that task has not been easy given that the "factual"

section of Plaintiffs' complaint is more accurately an olio of both fact and law.  In any

event, to give a complete factual picture, the court has also considered related public

records attached to the parties' various pleadings.  *See Alternative Energy, Inc. v. St.*

*Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (indicating that such

documents may be considered on a Rule 12(b)(6) motion).  As will become evident, the

events at issue developed in several stages.

A.  <u>Early Events</u>

On January 20, 1987, the City's Planning Board granted John and Thomas

Liquori (the "Liquoris"), who then owned a twenty-five acre parcel of land located at 136

City View Road, a special permit to construct twenty-three single family homes as a

private condominium association known as City View Commons.  (Complaint ¶¶ 17,

27.)  The special permit was granted pursuant to Westfield Zoning Ordinance 846

dated July 18, 1981 ("Ordinance 846").  (*Id.* ¶ 29.)  The plan approved by the special

permit contained three separate leaching systems for various units and required all

units to have a system for eventual connection to a public sewer once the City made

that available to the site.  (*Id.* ¶ 20.)  The special permit also provided as follows:

> All conditions must be satisfactorily met within the
> mentioned time frame or this decision will expire.  The
> petitioner may request extensions of time, in writing, from
> the Planning Board should it become necessary.  In any
> case, no extension of time will exceed thirty (30) days.

(*Id.* ¶ 28.)

The special permit did not expressly contain a "mentioned time frame" for the

3

project to expire, nor did it contain any specific condition that the project be completed within five years.  (*Id.* ¶¶ 29, 30.)  Plaintiffs, however, acknowledge that Ordinance 846 contained a five-year construction deadline.[2]  Still, Plaintiffs allege that the City had the discretion to extend the completion of any project for which a special permit had been granted.  (Complaint ¶ 31.)

On August 10, 1987, City View Commons, Inc. ("CVCI") was incorporated by its shareholders, Robert A. DeSimone and Emily J. Barbero.  (*Id.* ¶ 34.)  Shortly thereafter, on August 18, 1987, the Liquoris transferred their interest in the twenty-five acre parcel to CVCI.  (*Id.* ¶ 35.)

In September of 1987, eight months after approving the special permit but prior to the issuance of any construction permits, the City repealed Ordinance 846 and simultaneously adopted a new zoning code.  (*Id.* ¶¶ 36, 37.)  Plaintiffs assert broadly that the new code was intended to accommodate not only single-family detached dwellings but other land uses that preserve or respect the City's "open space."  (*Id.* ¶

---

[2]  In applicable part, Ordinance 846 provided as follows:

> If [a] condominium project is to involve the phasing overtime [sic] of individual buildings within the project being proposed, then a firm schedule of phasing, including construction dates and projected owner "turnover" times, is required.  If the owner fails to show reasonable progress towards the completion of the project, then the Planning Board reserves the right to call a hearing to consider revocation or suspension of the Special Permit.  *The project must be completed within five (5) years from date of application for the Special Permit.*

(Document No. 14 ("Defs.' Brief"), Exhibit C at 5 (emphasis added).)

38.)  However, in a related Housing Court action (see *infra*), Plaintiffs agreed more specifically that the new zoning code changed the property to a Rural Residential District and disallowed condominium development in such districts.  (Defs.' Brief at 3.)

On or about June 8 or 9, 1988, CVCI recorded a master deed for City View Commons as well as a declaration of trust identifying twenty-three to twenty-five units. (Complaint ¶ 49.)  At about the same time, CVCI transferred unit development rights to various developers, including City View Contemporaries, Inc. (Units 2, 3, 8, 9, 10 and 15), SBH Development Corp. ("SBH") (Units 4, 5, 6, 7, 11, 12, 13 and 14), Hills Bros. Builders, Inc. (Units 16 and 20), A.M.Y. Development Corp. (Units 17 and 19), and Dane Builders, Inc. (Unit 18) (hereinafter the "Developers").  (*Id.* ¶ 51.)  Pursuant to individual agreements, each developer was to construct its unit or units and, upon completion, "re-convey" the premises to CVCI to be conveyed, in turn, to a third party. (*Id.* ¶ 52.)  CVCI itself was responsible for completing the property's infrastructure.  (*Id.* ¶ 53.)  The condominium association, Plaintiffs assert, had the ability to repair any property.  (*Id.* ¶ 54.)

The Developers thereafter applied for and received permits to construct certain units.  (*Id.* ¶ 55.)  That same year, 1988, CVCI began construction of the infrastructure and installed a private paved road, storm drains, utilities (including water, cable television, telephone lines), certain septic systems and the sub-base of a road into all areas of the development.  (*Id.* ¶ 56.)  By late 1989, fifteen units -- actually, thirteen buildings and two foundations -- had been "constructed" and certain infrastructure completed, including a 2,500 foot private road, underground utilities and a septic

system, all with an investment of more than $2,000,000.  (*Id.* ¶ 18, 63.)

On December 31, 1990, CVCI was dissolved and, assertedly, the common areas of City View Commons passed to its shareholders, DeSimone and Barbero.  (*Id.* ¶ 64.) Plaintiffs also allege that, as a result of the recession in the early 1990s, the Resolution Trust Corporation ("RTC") and the Federal Deposit Insurance Corporation ("FDIC") acquired interests in a number of units.  (*Id.* ¶ 65.)

B. Plaintiffs Enter the Picture

On November 16, 1993, Saia, on behalf of the Plan, acquired Unit 18.  (*Id.* ¶ 66.) The Plan's ownership interest included a four percent undivided interest in the entire property's common area.  (*Id.*)  On December 13, 1995, the Plan acquired Unit 2 as well.  (*Id.* ¶ 71.)

In the interim, on January 28, 1994, Defendant Martin, the Assistant City Solicitor, wrote to Defendant Boardman, the Community Development Director, opining that City View Commons was an unlawful use under the new zoning code and that any property rights of the developers or owners had "evaporate[d]."  (*Id.* ¶ 67.)  At the same time, Defendant Kellogg, then Inspector of Buildings, denied Saia a building permit to perform repair work at City View Commons because, in his opinion, the "use and structures were not allowed under zoning and had not obtained protected status as pre-existing, nonconforming uses or structures."  (*Id.* ¶ 68.)  The Zoning Board of Appeals ("ZBA") upheld that decision on May 18, 1994.  (*Id.*  See also Defs.' Brief, Exhibit A.)

Saia, on behalf of the Plan, immediately appealed the denial of the building permit to the Hampden County Superior Court, raising claims under Mass. Gen. L. ch.

40A as well as the federal and Massachusetts constitutions.  (Complaint ¶ 69; Defs.'
Brief, Exhibit A.)  On December 11, 1996, however, Saia dismissed that action with
prejudice in exchange, Plaintiffs say, for Saia's proceeding to obtain control of City
View Commons, directly or indirectly, from the other unit owners, after which the City
would permit him to complete construction of all twenty-five units in accordance with the
special permit.  (*Id.* ¶ 70.)[3]  Plaintiffs allege that the City failed to honor its commitment
to allow completion of the project, even though Plaintiffs fulfilled their part of the
"agreement."  (*Id.*)[4]

By letter dated October 5, 2000, Defendant York, in his capacity as Building
Commissioner, notified both Saia and David Allen (the owner of Units 3, 8, 9, 10 and
15, but not a party to the instant action) that he had conducted an investigation of the
property and found "thirteen (13) buildings and two (2) foundations abandoned,
uninhabited and dangerous," namely, Units 2, 3, 4, 5, 6, 7, 12, 13, 14, 15, 16, 17, 18,
19 and 20.  (*Id.* ¶¶ 74, 88.)  York stated that the entire City View Commons project was
"abandoned, unused, uninhabited and a danger to public safety" and ordered the

---

[3]  Although Plaintiffs refer to this alleged arrangement as a "Settlement
Agreement," they acknowledged through counsel at oral argument that no such
agreement was reduced to writing.  Moreover, as far as the court knows, Plaintiffs
never sued the City in contract for its alleged violation of any such agreement.

[4]  For example, Plaintiffs allege the following: on August 26, 1996, the Plan
received a valid assignment of the development rights from DeSimone and Barbero, the
CVCI shareholders; on October 29, 1999, the Plan by assignment of a note and
mortgage from the RTC acquired the mortgage, property interest and assignment of
rents in Units 4, 5, 6, 7, 11, 12, 13 and 14; and on December 12, 2002, the Plan
obtained a quitclaim deed and all remaining interests from DeSimone and Barbero.  (*Id.*
¶¶ 72, 89 and 90.)  At all times, Plaintiffs continue, the City has taxed the development
as a condominium.  (*Id.* ¶ 91.)

owners to "remove all structures, foundations and debris and to make [the] lot level."
(*Id.*)  He indicated that failure "to remove the said violation will result in the City . . .
taking appropriate action to make this property safe to the public" and conform with the
applicable building and zoning codes.  (*Id.*)

C.  The Enforcement Action

That same day, October 5, 2000, the City filed an action in the Hampden County
Housing Court (Civil Action No. 00-0501A) to compel the abandonment of Plaintiffs'
property interests and the removal of all structures at City View Commons (hereinafter
"the enforcement action").  (*Id.* ¶ 86.)  Named as defendants were Saia (individually
and administrator of the Plan), the Limited Dividend Corporation of Westfield, and City
View Commons Condominium Trust, all of whom subsequently became Plaintiffs in the
instant action.  (See Document No. 5 ("Defs.' Motion to Stay"), Exhibit A.)  Also named
as defendants were David Allen (the owner of other units) and Gene Spear (apparently
a tenant of Unit 4).  (See *id.*)

On January 2, 2002, over one year after the City commenced the enforcement
action, the ZBA upheld the denial of Plaintiffs' request for building permits for certain
units.  (Complaint ¶ 99.  See also Document No. 16 ("Pls.' Brief") at 7.)  Plaintiffs
appealed that decision to the Hampden County Housing Court (Civil Action No. 02-
0045A) on February 1, 2002.  Plaintiffs' complaint was thereafter consolidated with the
City's enforcement action.  (*Id.*  See also Defs.' Brief, Exhibit C at 4.)

Subsequently, Plaintiffs -- as Defendants in the enforcement action -- filed
counterclaims alleging, *inter alia*, constitutional claims, *e.g.*, takings, equal protection,

and due process causes of action. (Defs.' Motion to Stay, Exhibit A.) In due course,

the City moved to dismiss those counterclaims, which motion was allowed by the court

on July 30, 2002. (*Id.*)[5]

Undeterred, Plaintiffs -- again as Defendants in the enforcement action -- moved

for summary judgment on the City's claims. (Defs.' Brief, Exhibit C.) By Memorandum

and Order dated March 12, 2003, Housing Court Judge William H. Abrashkin denied

Plaintiffs' motion. (*Id.*) Recognizing that the validity of the construction deadline was

central to the issues before him, (*id.* at 5), Judge Abrashkin undertook a comprehensive

analysis of both Ordinance 846 and the special permit issued on January 20, 1987, and

rejected Plaintiffs' arguments. In addition, Judge Abrashkin, *sua sponte*, entered partial

summary judgment in the City's favor, explaining as follows:

> [N]otwithstanding the fact that construction had commenced
> at the condominium within two years after the Planning
> Board's issuance of a Special Permit on January 20, 1987,
> as the condominium was not completed within 5 years of the
> date of the application, the Special Permit expired and the
> rights granted pursuant thereto lapsed as of July 8, 1991.

(*Id.* at 10.) Judge Abrashkin indicated, however, that he had not yet "reach[ed] the

question of the status of the existing units." (*Id.*) The parties have not informed this

---

[5] Meanwhile, Plaintiffs allege that sometime in late 2002, Martin, the Assistant City Solicitor, had a discussion with Plaintiffs' former attorney during which Martin stated that, because Saia had made too many enemies, the City wanted the project rezoned and developed by a different developer. (Complaint ¶ 93.) Similarly, Plaintiffs allege that sometime in early 2004 York visited the site and had a conversation with a "David Wroblenski" (his status is unclear) in which York stated that the City would approve further development for anyone other than Saia. (*Id.* ¶ 94.) Plaintiffs also allege that the property has since fallen into disrepair due to weather and acts vandalism, including the theft of appliances, windows and fixtures. (*Id.* ¶ 96.)

court of any further developments concerning this aspect of the enforcement action.

D.  The Present Action and Further Developments in the Enforcement Action

Plaintiffs filed the instant action on August 4, 2004.  Their complaint contains five counts: an alleged violation of "vested rights" under Mass. Gen. L. ch. 40A, §§ 8 and 9 (Count I); asserted violations of the takings clause under the Fifth and Fourteenth Amendments to the Constitution (Count II); alleged violations of equal protection and due process under the Constitution (Counts III and IV, respectively); and a claimed violation of the Massachusetts Civil Rights Act (Count V).  As relief, Plaintiffs seek, in the main, a variety of declaratory judgments, presumably pursuant to Fed. R. Civ. P. 57.  Although Plaintiffs filed this action on August 4, 2004, they did not serve Defendants with process until November 29, 2004, that is, just prior to the expiration of the 120-day deadline mandated by Fed. R. Civ. P. 4(m).  (See Document No. 2.)  In the interim, on October 7, 2004, Plaintiffs filed what they styled an amended "Counterclaim Complaint" in the enforcement action.  (Defs.' Motion to Stay, Exhibit D.)  The Counterclaim Complaint is virtually a verbatim rendering of the complaint currently before this court, *i.e.*, it targets the same Defendants (the unnamed members of the Westfield Zoning Board and City Council, Kellogg, York, Boardman, Reardon, Casey and Martin); it lists the same five causes of action (among a few others); and it seeks virtually identical declaratory relief.  (See *id.*, Exhibit D.)[6]

---

[6]  On November 10, 2004, Martin filed a limited motion to dismiss the Counterclaim Complaint against him, arguing that he was never a party to the enforcement action and, therefore, could not be the subject of a "counterclaim."  (*Id.*, Exhibit E.)  Judge Abrashkin, Defendants report, allowed Martin's motion.  (*Id.* at 3.)

On December 20, 2004, in this forum, Defendants filed a motion to stay Plaintiffs' action, arguing that Plaintiffs' "misdeeds" -- *i.e.*, their "fail[ure] to advise the [Housing] Court, . . . counsel, or the parties that there was, simultaneously, an action which had been previously filed in th[e federal] Court" -- had placed Defendants "in the position of having to respond to what are virtually identical complaints in two separate courts." (*Id.*)  After considering the issue, the undersigned, in a May 17, 2005 Electronic Order, deemed the motion to stay moot, "Defendants having so indicated in [a previously filed] motion for extension of time."

Eventually, Defendants filed the motion to dismiss presently before the court. Plaintiffs tendered an opposition and Judge Ponsor, as indicated, referred the motion to this court for a report and recommendation.  The court heard oral argument and is now poised to offer its recommendation.[7]

### III.  DISCUSSION

Defendants offer a panoply of reasons why Plaintiffs' complaint should be dismissed.  Most importantly, in this court's opinion, Defendants argue that, in light of the ongoing litigation in state court, certain federalism principles, most particularly the *Younger* abstention doctrine, mandates dismissal.  Defendants also argue that the statute of limitations had expired on all of Plaintiffs' claims before suit was commenced. Defendants assert as well that *res judicata* mandates dismissal, referring in particular to Saia and the Plan having voluntarily dismissed with prejudice their 1994 action in the

---

[7]   The court acknowledges that too long a period of time has passed since oral argument.  It does note, however, that the parties have not seen fit to inform the court of any further developments in the consolidated Housing Court litigation.

Hampden County Superior Court.  Finally, Defendants argue that Plaintiffs' claims should be dismissed on substantive grounds.

The court does not find it necessary to address each of Defendants' arguments. In the court's view, Defendants' abstention argument -- in conjunction with other federalism doctrines -- warrants allowance of their motion to dismiss.  Nevertheless, the court will touch on two of Defendants' other arguments, statute of limitations and *res judicata,* in order to provide a more comprehensive report and recommendation. Should Judge Ponsor agree, this added analysis might also serve to caution Plaintiffs against trying to resurrect their claims in this forum in the event that the state court litigation is resolved against them.

A.  Federalism Concerns

As indicated, Defendants argue that the federalism-based abstention doctrine established in *Younger* and its progeny mandates dismissal of this action.  In short, Defendants assert that this court would needlessly inject itself into ongoing state proceedings were it inclined to adjudicate the merits of Plaintiffs' claims in this forum. *See generally Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423 (1982); *Trainor v. Hernandez*, 431 U.S. 434 (1977); *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975).  This court agrees, not only because of *Younger* but a number of other federalism doctrines as well.

1.  *Younger*

Citing concerns for comity and federalism, the Supreme Court held in *Younger* that, absent extraordinary circumstances, federal courts should abstain from exercising

12

their jurisdiction in the face of ongoing state proceedings.  *Id.*, 401 U.S. at 54.  Although

*Younger* itself involved state criminal proceedings, later decisions extended its reach to

other state proceedings.  *See Middlesex County*, *supra* (civil proceedings); *Ohio Civil*

*Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619 (1986) (administrative

proceedings).  The First Circuit, too, has often applied *Younger* in various contexts.

*See, e.*g., *Bettencourt v. Bd. of Registration in Med.*, 904 F.2d 772, 776 (1st Cir. 1990);

*Duty Free Shop, Inc. v. Administracion de Terrenos*, 889 F.2d 1181, 1183 (1st Cir.

1989).  Significantly, for purposes here, "*Younger* has been extended to . . . civil

proceedings . . . brought by the state as enforcement actions against an individual."

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 69 (1st Cir. 2005) (citing

cases).

The Supreme Court has enumerated three conditions which, if met, require a

federal court to hold off in the face of a pending state proceeding: (1) if the state

proceeding advances an important state interest, (2) if the federal plaintiff will have an

adequate opportunity to litigate its federal claims in the state, and (3) if the state

proceeding is judicial, as opposed to legislative, in nature.  *Dayton Christian*, 477 U.S.

at 627.  In this court's opinion, all three criteria have been met.

First, the proceedings pending in Housing Court concern important state

interests, namely, enforcement provisions governing land use and zoning, as well as

counterclaims concerning the taking of property by a municipality.  *See also Esso*

*Standard Oil Co. v. Cotto*, 389 F.3d 212, 217 (1st Cir. 2004) (using *Younger* to require

abstention in cases where environmental board brought state administrative

proceedings against gasoline station owner seeking to fine it).  Second, Plaintiffs have

an adequate opportunity to litigate the federal claims raised in their Housing Court

Counterclaim Complaint.[8]   Third, the ongoing proceedings in Housing Court are

undoubtedly "judicial in nature."

It is well settled that, "[w]here all of the requirements for *Younger* abstention are

met, the district court must dismiss the federal action.  *South Boston Allied War*

*Veterans Council v. Zobel*, 830 F. Supp. 643, 648-49 (1993) (citing *Gibson v. Berryhill,*

411 U.S. 564, 577 (1973)).  *Accord Bettencourt*, 904 F.2d at 781 (similar).  This is

particularly so when, as here, there are no "extraordinary circumstances" which might

otherwise preclude *Younger* abstention.  *See FTC v. Standard Oil Co.,* 449 U.S. 232,

244 (1980) (holding that even substantial and unrecoupable loss does not amount to

irreparable injury).  At bottom, the relief sought here by Plaintiffs would interfere with a

pending enforcement action, which involves Plaintiffs' Counterclaim Complaint as well.

*See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (*Younger* applies

where the relief asked of the federal court interferes with state proceedings).

Accordingly, in this court's view, *Younger* warrants allowance of Defendants' motion to

dismiss.

2. Other Federalism Doctrines

At least four other federalism doctrines, in the court's estimation, support

dismissal of Plaintiffs' complaint.  First, even were the court inclined to apply the more

---

[8]  Saia on behalf of the Plan pursued similar claims in the Superior Court over one decade ago.  (See discussion *infra*.)

limited abstention doctrine set forth in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976), the factors developed by the First Circuit albeit non-exclusive, would call for dismissal.  *See KPS & Assocs. v. Designs by FMC, Inc.*, 318 F.3d 1, 10 (1st Cir. 2003).  Thus, while the federal forum is certainly not inconvenient to the parties, (factor two), the Housing Court has already assumed jurisdiction over the property at issue (factor one), it has been overseeing the case longer than this court (factor four) and has the ability to address both the state and federal issues at play (factor six), state law controls a good part of the parties' dispute (factor five), and dismissal would clearly avoid piecemeal litigation (factor three). Moreover, there appears to be some contrivance on Plaintiffs' part in pursuing this federal action (factor seven).  As described, Plaintiffs had long been in state court when they chose to file the instant action, their complaint parallels the exact claims which they asserted in their Counterclaim Complaint in Housing Court and, while the instant complaint was filed *before* the Counterclaim Complaint was filed in Housing Court, it was thereafter only served on Defendants.  Given these particulars, the court believes that discretion also calls for dismissal of the instant matter under *Colorado River.*

Second, there is a body of federalism decisions which cautions courts to tread carefully in Rule 57 declaratory judgment actions in particular.[9]  These decisions

---

[9]  True, those actions are often governed by the Declaratory Judgment Act ("DJA"), a federal statute designed to enable parties "to clarify legal rights and obligations before acting upon them."  *Ernst & Young v. Depositors Econ. Protection Corp.*, 45 F.3d 530, 534 (1st Cir. 1995) (citing *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 649-50 (3d Cir. 1990) (in turn, citing legislative history)).  The DJA, however, "is mirrored by Fed. R. Civ. P. 57" and, as such, "[t]he statute and the rule are functionally equivalent."  *Ernst & Young*, 45 F.3d at 534 n.8 (citation omitted).

indicate that there is "neither . . . an unflagging duty upon the courts to decide declaratory judgment actions nor . . . an entitlement to litigants to demand declaratory remedies." *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 493 (1st Cir. 1992) (citing, *inter alia*, *Green v. Mansour*, 474 U.S. 64, 72 (1985)).  *See also DeNovellis v. Shalala*, 124 F.3d 298, 313 (1st Cir. 1997).  Rather, the Supreme Court has explained, a district court's decision to dismiss a declaratory judgment action may be informed by its factual nexus to a pending state matter.  *See Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 495 (1942).  The question for a court presented with such a situation, the Supreme Court stated, is to determine "whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can better be settled in the proceedings pending in the state court."  *Id*.  In making such a determination, the Court continued, a court will need to examine "the scope of the pending state court proceeding and the nature of defenses open there," an inquiry which naturally entails consideration of "whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding, whether necessary parties have been joined, whether such parties are amenable to process in that proceeding, *etc*."  *Id*.

The instant case, in this court's estimation, falls well within these parameters. As described, it appears that the claims of all parties in interest can satisfactorily be adjudicated in Housing Court via the City's enforcement action and Plaintiffs' counterclaims.  In addition, the same parties have been joined in the state action and, apparently, were amenable to process.  As a result, this court might well be indulging in "[g]ratuitous interference" if it permitted Plaintiffs' action to proceed when the parties

16

have sufficient opportunity to resolve the issues in the pending state court action.  *See id.  See also Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (rejecting claim that district court should dismiss declaratory judgment action only in "exceptional circumstances").

Third, Plaintiffs' takings claim, arguably the crux of their lawsuit, does not appear ready for adjudication.  *See SFW Arecibo, Ltd. v. Rodriguez*, 415 F.3d 135, 139 (1st Cir. 2005) (holding that a takings claim by developers was not ripe because they had not sought just compensation through state law procedures).  To be sure, unlike the developers in *Arecibo,* Plaintiffs in the case at bar are pursuing such compensation in the state's forum.  Nonetheless, the First Circuit's admonition in *Arecibo* is no less controlling:  "It is well settled that 'if a state provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedures and been denied just compensation.'"  *Id.* (quoting *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 195 (1985)).

Fourth, Plaintiffs' due process claim in particular -- if not their other causes of action as well -- runs up against yet another federalism hurdle.  The First Circuit has repeatedly held, as Judge Ponsor recently recognized, "that land usage controversies between a plaintiff and a state or local administrative and political entities do not rise to the level of due process violations, absent evidence of 'fundamental procedural irregularity, racial animus, or the like.'"  *Matney v. City of N. Adams*, 359 F. Supp. 2d 20, 23 (D. Mass. 2005) (quoting *Creative Environments, Inc. v. Estabrook*, 680 F.2d

17

822, 831 (1st Cir. 1982)).  "Indeed," Judge Ponsor continued, "even a 'bad faith refusal

to follow state law in such local administrative matters does not amount  to a

deprivation of due process rights where the state courts are available to correct the

error.'"  *Id.* (quoting *Chiplin Enterprises, Inc. v. City of Lebanon*, 712 F.2d 1524, 1528

(1st Cir. 1983)).

 Here, as in *Matney*, even assuming that Defendants' actions "somehow

amounted to an abuse of power . . . or violated some state regulation, ordinance or

statute," there appears to be "no basis to find that these actions rose to the level of due

process violations."  *Id.*  Moreover, "no allegation is offered of race-based or other

discriminatory animus."  *Id.*  Further, "no allegation of any fundamental procedural

irregularity is offered."  *Id.*  On the contrary, Plaintiffs acknowledge, they have sued or

countersued the various Defendants in at least two competent state tribunals, the

Superior Court and the Housing Court, and that the Housing Court case remains open.

*See id.* (declining jurisdiction over land use dispute that was the subject of a Land

Court action pending on appeal).  *Cf. Raskiewicz v. Town of New Boston*, 754 F.2d 38,

44 (1st Cir. 1985) (rejecting conspiracy claims in land use dispute despite board's

repeated denial of permits and statement that plaintiff "would never be given a . . .

permit"); *Estabrook*, 680 F.2d 822 at 83 (holding conspiracy allegations in land use

dispute did not amount to constitutional violations where, *inter alia*, the town was

motivated by parochial interests).

 In the end, these federalism doctrines, varied though they may be, all point to

dismissal of the instant action.  As Judge Ponsor observed in *Matney*, "if federal judges

18

were to thrust themselves into these kinds of disputes, then every zoning decision and every dispute about the application of a local ordinance would be tried in federal court." *Id.*, 359 F. Supp. 2d at 23. *See also Raskiewicz*, 754 F.2d at 44 ("[T]his court has repeatedly said that federal courts do not sit as a super zoning board or a zoning board of appeals . . . [and] we feel confident that where, as here, the state offers a panoply of administrative and judicial remedies, litigants may not ordinarily obtain federal court review of local zoning and planning disputes by means of 42 U.S.C. § 1983.") (citations omitted). For all those reasons, therefore, the court will recommend that Defendants' motion to dismiss be allowed.

## B. Defendants' Other Arguments

As indicated, the court will address at least two of Defendants' alternative arguments for dismissal, their statute of limitations argument -- which targets Counts III, IV and V of the complaint, but which appears equally applicable to the other causes of actions -- and their *res judicata* argument. While these issues are not entirely fleshed out by the parties -- and oftentimes run into one another -- they loom large and may well offer sufficient alternative grounds for allowing Defendants' motion to dismiss.

Two preliminary matters, however, should be noted, both of which also limit the viability of Plaintiffs' claims in federal forum. First, Plaintiffs indicated in their opposition to Defendants' motion that they do not intend to pursue any claims in this forum against the City itself. Second, although Plaintiffs apparently wish to pursue claims here against the six "John and Jane Doe" defendants, none has been served with process or otherwise identified and should probably be dismissed from this action.

19

As to Defendants' first alternative argument, the parties are well aware that federal constitutional and civil rights claims are subject to a three year statute of limitations, *Gilbert v. Cambridge*, 932 F.2d 51, 57 (1st Cir. 1991), as are parallel claims brought under Massachusetts law, *see Doty v. Sewall*, 784 F.2d 1, 11 (1st Cir. 1986). The limitations period begins to run "upon the invasion of the plaintiffs' interests." *Gilbert*, 932 F.2d at 57 (1st Cir. 1991). Unfortunately for Plaintiffs, all the discrete acts upon which their complaint is based appear to have accrued more than three years prior to the commencement of suit. Thus, whether they are challenging Ordinance 846 itself, the new zoning code adopted in September of 1987, the special permit granted on January 20, 1987, or the October 5, 2000 enforcement action commenced by the City,[10] Plaintiffs appear to have missed the three year statute of limitations.

---

[10]    The operative paragraph of Plaintiffs' complaint alleges as follows:

> As a result of their own action, including Defendants [sic] i) denial of permits to complete the construction of City View Commons for single-family structures and uses that were validly permitted by the City and constructed in reliance upon such permits, ii) enforcement of a repealed Ordinance 846, including the five-year Construction Deadline, outside the statute of limitations for validly permitted uses, iii) claim that it has outlawed condominium ownership which it repeatedly mislabels as a "use" to advance its claim and for which it has no authority to regulate the form of ownership, iv) denial of building permits to complete the project properly begun within the time limits of M.G.L. c. 40A §§ 6 and 9, and in harmony with the City's current zoning ordinance, and v) objective to have the properly leveled by Plaintiffs without just compensation, rezoned and developed by a developer other than Plaintiffs, *and* in violation of clearly established law, the City's Zoning Scheme and its Enforcement Action along with its systemic denial of building permits constitute government action and acts of lawlessness that are

It is undisputed that Saia and the Plan knew of the existence of Ordinance 846 and the repeal thereof prior to their purchase of Unit 18 on November 16, 1993. (Complaint ¶ 66.)  Moreover, it is undisputed that Plaintiffs had knowledge of the City's position with respect to the "evaporat[ion]" of the owners' rights under the zoning code as of January 28, 1994, as alleged in paragraph 68 of the complaint, or, at the very latest, May 18, 1994, the date the City denied the building permit sought in connection with Unit 18.  In addition, the complaint reveals that Saia and the Plan availed themselves of the opportunity to advance in the Superior Court many of the same allegations they assert here.  This, as indicated, was ten years prior to the institution of the instant litigation.

To be sure, Plaintiffs, relying on *Lopes v. City of Peabody*, 629 N.E.2d 1312 (Mass. 1994), argue that a subsequent purchaser of property can challenge the validity of an existing zoning ordinance.  That, of course, is true.  As the Supreme Judicial Court ("SJC") explained in *Lopes*, "[a] rule that a purchaser of real estate takes subject to all existing zoning provisions without any right to challenge any of them would threaten the free transferability of real estate, ignore the possible effect of changed circumstances and tend to press owners to bring actions challenging any zoning provision of doubtful validity before selling their property."  *Id.* at 1315.

There is, however, a fatal problem with Plaintiffs' argument.  Unlike the plaintiff

---

impossible to relate to any legitimate government objectives.

(Complaint ¶ 108 (emphasis in original).)

in *Lopes*, Plaintiffs, as successor owners of units at City View Commons, had *themselves* previously challenged the constitutional validity of both the zoning code and the Ordinance, knowing full well that the City deemed the construction rights of the owners to have evaporated.  That Plaintiffs chose, in the face of this knowledge, to thereafter obtain additional interests in the very property which was the subject of their previous challenge ought not, without more, afford them the opportunity to extend the statute of limitations with regard to what are essentially the same constitutional claims. *Compare Lopes*, 629 N.E.2d at 1313.

Relatedly, the last date Plaintiffs purchased additional units at City View Commons, October 29, 1999 (see Complaint ¶ 72), is also more than three years prior to the filing of the present litigation.  Likewise, Plaintiffs offer no explanation as to why they should be allowed to pursue claims in this forum nearly four years after the City filed its enforcement action on October 5, 2002, with respect to most, if not all, of the units at City View Commons.  At best, Plaintiffs aver in passing that they have a general right to challenge the validity of a  zoning ordinance in an enforcement action. That may be true, but it has little to do with Plaintiffs' attempt to seek the same relief here.[11]

Plaintiffs' reliance on *Lopes* is questionable on other grounds as well.  In short, Plaintiffs fail to note that *Lopes* was overruled in ways significant here by *Gove v.*

_____

[11]  Defendants also assert that Plaintiffs, through counsel, admitted in the Housing Court litigation that the statute of limitations would preclude them from pursuing the very claims they filed here and offer as evidence a sealed tape recording of the Housing Court hearing.  This court has declined to listen to the recording since it has no bearing on the instant recommendation.

*Zoning Bd. of Appeals of Chatham*, 831 N.E.2d 865 (Mass. 2005). Relying on the

Supreme Court's decision in *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005), the

SJC determined that, "[i]n practical effect, *Lingle* renders a zoning ordinance valid

under the United States Constitution unless its application bears no reasonable relation

to the state's legitimate purpose.'" *Gove*, 831 N.E.2d at 870 (quoting *Exxon Corp. v.*

*Governor of Maryland*, 437 U.S. 117, 125 (1978)). "This highly deferential test," the

SJC explained, "neither involves 'heightened scrutiny' . . . nor allows a court to question

the 'wisdom' of an ordinance." *Id.* (citations omitted).

In apparent recognition of these hurdles, Plaintiffs switch gears. They argue that

the three year statute of limitations really commenced on January 2, 2002, thereby

making their complaint, filed August 4, 2004, timely. That date, January 2, 2002, was

the day the ZBA evidently rendered a final decision upholding the denial of building

permits for yet other units purchased by Plaintiffs at City View Condominiums. The

ZBA's decision, however, was immediately appealed to Housing Court. Since that

litigation remains outstanding, the instant suit -- statutes of limitations issues aside --

should be dismissed on federalism grounds for all the reasons previously described.

Plaintiffs' effort to avoid Defendants' statute of limitations argument also runs up

against Defendants' *res judicata* argument, namely, that Plaintiffs had already availed

themselves of the opportunity to pursue most, if not all, of their claims in the prior

Superior Court action. As indicated, Saia's stipulation of dismissal with prejudice of

that action in 1994 may well have operated as a final adjudication on the merits of

those claims, thereby precluding the same causes of action. *See Lawlor v. Nat'l*

*Screen Service Corp.*, 349 U.S. 322, 327 (1955); *Bagley v. Moxley*, 555 N.E.2d 229, 232 (Mass. 1990).

In defense, Plaintiffs argue that one, if not two, of the plaintiffs here -- the City View Commons Condominium Trust and the Limited Dividend Corporation -- were not parties to the Superior Court action and could not have exhausted their remedies. In particular, Plaintiffs argue, the City View Commons Condominium Trust only came under Plaintiffs' collective control in late 1999.[12]

Once again, certain factual matters need to be clarified with respect to Plaintiffs' argument. First, the allegation in the complaint which Plaintiffs cite regarding their "control" of the City View Commons Condominium Trust, paragraph 72, states nothing of the sort. It simply refers to Plaintiffs having acquired interests in Units 4, 5, 6, 7, 11, 12, 13 and 14 (in addition to previously acquired Units 2 and 18 (see Complaint ¶¶ 66, 71)). It makes no mention of any "control" by Plaintiffs of the trust itself. Second, Plaintiffs fail to acknowledge that David Allen, who is *not* a party to this action, owns other units at City View Commons; nor do Plaintiffs explain how their ownership of what appears to be a minority of units gives them "control" of the trust. Third, Plaintiffs fail to recognize that Saia and the Plan's ownership of Unit 18 -- which gave them a four percent interest in the common areas but no "control" of the City View Commons

---

[12] The complaint describes the Limited Dividend Corporation as having been organized on October 3, 1997. (Complaint ¶ 5.) It asserts that Saia is the President, Treasurer and Agent/Clerk of the Limited Dividend Corporation with offices at the same location as the Plan and, for that matter, Saia's law office. (See *id.* ¶¶ 3-5.) Nowhere in the complaint, however, do Plaintiffs describe how the Limited Dividend Corporation came to own property at City View Commons, although the City's enforcement action does name it as one of the respondents.

Condominium Trust -- did *not* prevent them from raising what are essentially the same constitutional claims in 1994 in Superior Court which Plaintiffs wish to pursue here.

In the court's view, Plaintiffs appear to be in no different a position with regard to their constitutional claims at this juncture than Saia on behalf of the Plan -- with whom City View Commons Condominium Trust and the Limited Dividend Corporation are obviously in privity -- were in 1994 when they sought relief in Superior Court. If this court were to permit Plaintiffs to proceed for the reasons they now proffer, they could purchase remaining units and seek the same relief each time they were dissatisfied with the outcome of a prior lawsuit.

To avoid dismissal, Plaintiffs make one final assertion, namely, that the present action involves individual defendants who were not part of the 1994 action. In particular, Plaintiffs assert that the claims against these individuals did not arise until Plaintiffs discovered the "improper motives" for the enforcement action. These motives, Plaintiffs allege, led to the systematic denial of building permits to Plaintiffs' remaining units in November of 2001, denials later upheld by the ZBA on January 2, 2002.

As an initial matter, the court notes that the factual allegations of improper motive -- deeply imbedded in Plaintiffs' constitutional claims -- appear to concern Martin and York only. (See n.5 *supra*.) Further, Plaintiffs' assertions to the contrary, the same factual allegations against these individuals are specifically alleged in Plaintiffs' "Counterclaim Complaint" in Housing Court. As a result, the parties (and this court) come full circle to the very reason why abstention is appropriate. As the SJC has often recognized: "Considerations of fairness and the requirements of efficient

25

judicial administration dictate that an opposing party in a particular action as well as the court is entitled to be free from continuing attempts to relitigate the same claim." *Wright Mach. Corp. v. Seaman-Andwall Corp.*, 307 N.E.2d 826, 830 (Mass. 1974). *Accord Bagley*, 555 N.E.2d at 232.

## IV. CONCLUSION

For the myriad of federalism doctrines described, the court recommends that the court abstain from proceeding in this case and ALLOW Defendants' motion to dismiss.[13]

DATED: September 7, 2006

              /s/ Kenneth P. Neiman
              KENNETH P. NEIMAN
              Chief Magistrate Judge

---

[13] The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.